IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANTS FOR THE CELLULAR TELEPHONES:<br><br>**I.    White iPhone with a clear case**<br>**II.   Gray Samsung cellular telephone with a brownish/clear case**<br>**III.  Gray Apple iPhone with a reddish/clear case**<br>**IV.  Black Nokia cellular telephone (Model N139DL)**<br>**V.   Black Nokia cellular telephone with cracked screen**<br>**VI.  Black Samsung Galaxy S7 cellular telephone**<br>**VII. Black Samsung Galaxy Note8 cellular telephone**<br>**VIII. Black Alcatel cellular telephone (Model A406DL)**<br>**IX.  Black Motorola cellular telephone (Model moto e6 XT2005DL)** | Case No.<br><br>  2:24-cr-343 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Mike Gurrieri, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am a Special Agent with the South Carolina Law Enforcement Division's Office of Alcohol, Narcotics, and Vice Services. I am currently assigned as a Task Force Officer for the DEA Charleston Resident Office (CRO).  I have approximately sixteen years in the law enforcement and investigations field. I started my law enforcement career in 2005 with the Goose

1

Creek Police Department, located in Goose Creek, SC. My career includes working for the Berkeley County, SC Sheriff's Office Drug Enforcement Unit for approximately five years. I also worked in the Charleston County, SC Sheriff's Office Metro Major Case Unit for approximately one year. Throughout my law enforcement career, I have conducted and/or participated in numerous drug related investigations. Among other things, I have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of recorded conversations, and have conducted or participated in investigations that included the interception of electronic communications. I have written and submitted to the Court numerous affidavits in support of arrest warrants and search warrants. I have also received additional training in these forms of investigations from the DEA and other federal and state government agencies. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of drug proceeds, and the terminology and coded language used by drug traffickers to communicate.

3.      Your affiant has extensive training on the use of electronic communication devices as they pertain to various narcotic distribution and trafficking investigations.  You affiant has received formal training in the fields of interdiction of illegal drugs, drug identification, interview and interrogation, law pertaining to search and seizure, surveillance operations, Title III intercept laws and procedures, affidavit drafting, drug cartels investigations, and intelligence collection. Based on your affiants training and experience, it is known that drug traffickers utilize various communication methods, such as cellular telephones, Facebook Messenger, and computers to conducted illegal activity. Drug traffickers often have photographs and text messages on their cellular devices which show illegal activity. During the course of drug investigations, I have

reviewed data from Cellebrite extractions performed on seized cellular telephones. These extractions of data which were performed by trained DEA Agents and or City of Charleston Police Department Forensic Services Officer. The data supplied often resulted in further evidence of crimes and identified co-conspirators

4.    Accordingly, based on my training and experience and the totality of the evidence detailed below, I submit that probable cause exists to believe that the Devices contain evidence of violations of Title 18, United States Code, Sections 922 and 924, and Title 21, United States Code, Sections 841, 843(b), and 846. Further, probable cause exists to believe that on the cellular telephones sought to be searched there is now concealed evidence of the commission of, the fruits of, or property which has been used as the means of committing those crimes, all of which is more particularly described in Attachment B hereto.

### IDENTIFICATION OF DEVICES TO BE EXAMINED

5.    The property to be searched are nine (9) cellular telephones ("**DEVICES**") described below that were seized on June 21, 2023, during the execution of federal arrest warrants and a federal search warrant.

I.    **White iPhone with a clear case recovered from the vehicle being driven by John Maurice ANDERSON**

II.    **Gray Samsung cellular telephone with a brownish/clear case (IMEI 1: 351558960200287, IMEI 2: 352618330200281, S/N: RFCN707LZHR), recovered from the vehicle being driven by John Maurice ANDERSON**

III.    **Gray Apple iPhone with a reddish/clear case recovered from the vehicle being driving by John Maurice ANDERSON**

IV.   **Black Nokia cellular telephone (Model N139DL) assigned telephone number: (803) 942-4023, recovered from Aaron BOOKER**

V.    **Black Nokia cellular telephone with cracked screen recovered from Aaron BOOKER**

VI.   **Black Samsung Galaxy S7 cellular telephone recovered from the residence of John Maurice ANDERSON at 203 McDill Lane in Hampton, SC**

VII.  **Black Samsung Galaxy Note8 cellular telephone recovered from the residence of John Maurice ANDERSON at 203 McDill Lane in Hampton, SC**

VIII. **Black Alcatel cellular telephone (Model A406DL) Phone number: 854-213-0757, recovered from Roy FELDER**

IX.   **Black Motorola cellular telephone (Model moto e6 XT2005DL) Phone number: (803) 398-6315, recovered from Roy FELDER**

6.    The above documented **DEVICES** are currently in the custody of the DEA CRO and are in the Non-Drug Evidence vault at the DEA CRO located at 3950 Faber Place Drive, Suite 200, North Charleston, SC 29405.

7.    The applied for warrant would authorize the forensic examination of the **DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

<u>**ESTABLISHED ROLES WITHIN THE ANDERSON DRUG TRAFFICKING ORGANIZATION**</u>

8.    John Maurice ANDERSON is a poly-drug supplier of both Fentanyl and crystal methamphetamine (i.e. "ice") and operates in the low country area of South Carolina. ANDERSON has been a target of several law enforcement investigations since approximately

4

2019 and this current investigation being conducted by the DEA CRO started in January 2023. The investigation has revealed that ANDERSON has two (2) couriers/co-conspirators, Aaron Maurice BOOKER and Roy FELDER, who assist in the distribution of the illegal drugs.  The investigation has also revealed that Larry RILEY, Jr. is a source of supply for ANDERSON for crystal methamphetamine.  Agents have utilized both a South Carolina Law Enforcement Division (SLED) confidential source (CS) and a SLED Undercover Agent (UC) to arrange controlled purchases of both Fentanyl pills and ounce quantities of crystal methamphetamine. The CS and UC coordinated the controlled purchases with ANDERSON through both phone calls and text messages to ANDERSON's cellular telephone.

### EVENTS OF THE INVESTIGATION/PROBABLE CAUSE

### CONTROLLED PURCHASE #1

9.      On February 8, 2023, the DEA CRO, SLED, and the Jasper County Sheriff's Office (JCSO) utilized the CS to conduct a controlled purchase of twenty-five (25) suspected fentanyl pills from ANDERSON at 6841 Bees Creek Road, Ridgeland, SC.  The CS utilized $500.00 in pre-recorded HIDTA authorized funds to conduct the transaction.

10.     At approximately 1:48 pm, TFO Michael Gurrieri, Detective Qutique Manor (JCSO), Robert Edwards (JCSO), and Special Agent Jesse Johnson (SLED) met with the CS at a pre-determined meeting location prior to the controlled purchase of fentanyl pills from ANDERSON.  Text conversation provided by the CS showed ANDERSON texted the CS from

cellular telephone number: (803) 942-3803[1].  The text read: "4 is perfect for the latest but he's shooting to be there by 3:30!!! So just get into with me before 3:00 so I can get into with him and get you tooken care of".  The CS stated that ANDERSON texts in the third person in an attempt to thwart law enforcement investigations involving his drug trafficking.   At 1:57 pm, ANDERSON texted the CS: "Reaching out now wat think will you be ready".

11.    At approximately 2:09 pm, TFO Gurrieri and Detective Manor searched the CS for contraband with negative results. At 2:10 pm, the CS texted ANDERSON and stated, "Tell him do 25 too please. I got a kittle extra".  At 2:15pm, ANDERSON replied to the CS's text: "OK I'm calling him but you know he really was doing the new ones for 23 bcus he had to pay extra for those ones but I told him you was going through somethings so work with you for a while, so I'll tell him but he not taking less than 20 right now but just count up and let me know what you have and we'll go from there. Need to be exact sweetie".  The CS replied, "500 exactly".  Anderson then replied, "Ok sweetie letting him know now. We'll be head ur way soon". At approximately 2:13 pm, the CS was provided pre-recorded HIDTA authorized funds and audio/video surveillance recording equipment to utilize during the controlled purchase.

12.    At approximately 2:42 pm, TFO Gurrieri, TFO Jonathan Nacy, and Detective Qutique Manor dropped the CS off at 6841 Bees Creek Road, Ridgeland, SC. At 2:47 pm, ANDERSON texted the CI, "Lol ook sweetie head to him now".  At 3:22 pm, ANDERSON texted the CS, "A lil close. We close".

---

[1] Agents are unaware of the specific cellular telephone associated with phone number: 803-942-3803 and is unaware which of the five (5) cellular telephones recovered during the arrest of ANDERSON and the execution of the search warrant conducted at 203 McDill Lane, Hampton, South Carolina (ANDERSON's residence) are assigned phone number: 803-942-3803.

13.     At approximately 3:32 pm, ANDERSON arrived at 6841 Bees Creek Road, Ridgeland, SC in a black 2007 Chevrolet Tahoe bearing South Carolina license plate 3199MQ. ANDERSON was driving the vehicle and in the front passenger seat was Aaron Maurice BOOKER (a/k/a "AB"). The CS stated that he/she went to the passenger side window and had a short conversation with BOOKER.  The CS stated that he/she exchanged the pre-recorded funds with BOOKER for a clear plastic bag containing blue pills suspected of containing fentanyl. At approximately 3:33 pm, ANDERSON and BOOKER departed the area.  South Carolina license plate 3199MQ is registered to Jessica Johnson at 221 Cora Road, Furman, SC.

14.     At approximately 3:42 pm, TFO Gurrieri, TFO Nacy, and Detective Manor picked up the CS. The CS provided the agents with the clear plastic bag containing blue pills containing suspected fentanyl that the CS received from ANDERSON/BOOKER.  At approximately 3:53 pm, TFO Gurrieri, TFO Nacy, and Detective Qutique arrived back at the pre-determined meeting location with the CS. At approximately 3:56 pm, the CS was searched for contraband with negative results.  Agents also retrieved the audio/video surveillance equipment from the CS.  The CS was then debriefed by agents about the controlled purchase from ANDERSON.

15.     The DEA Mid-Atlantic Laboratory confirmed that the substance contained in the clear plastic bag was 2.53 grams of Fentanyl with a substance purity of 8%.

## CONTROLLED PURCHASE #2

16.     On March 14, 2023, the DEA CRO, SLED, the JCSO, and the Hardeeville Police Department (HPD) utilized the CS and a SLED UC Jarrett Maffet to conduct a controlled purchase of ten (10) fentanyl pills and six (6) ounces of crystal methamphetamine ANDERSON

at 6841 Bees Creek Road, Ridgeland, SC.  The CS/UC utilized $2,000.00 in pre-recorded HIDTA authorized funds to conduct the transaction.

17.     On March 13, 2023, the CS coordinated the controlled purchase of the illegal drugs with ANDERSON through phone calls and text messages to ANDERSON's cellular telephone number (803) 942-3803.

18.     On March 14, 2023, at approximately 6:10 pm, SA Brendan McSheehy and TFO Jason Jarrell were driving towards Varnville, SC on Yemaseee Highway when they observed a black Chevrolet Tahoe being driven by ANDERSON pass them heading towards Yemassee, SC. SA McSheehy and TFO Jarrell conducted surveillance on the Chevrolet Tahoe and surveilled the vehicle to the Loves Travel Center, located at 409 Yemassee Highway, Yemassee, SC. At approximately 6:10 pm, SA McSheehy observed the Chevrolet Tahoe pull to Pump 6 and park at the gas pump.

19.     At approximately 6:24 pm, ANDERSON and BOOKER exited the Chevrolet Tahoe.  BOOKER went to the gas pump and began to pump gas into the Chevrolet Tahoe while ANDERSON stood next to the Chevrolet Tahoe with a cellular telephone in his hand.  At approximately 6:26 pm, SA McSheehy observed a silver Dodge Charger with South Carolina license plate WBH 384 enter the Loves Travel Center.  At approximately 6:27 pm, the CS received a text message from ANDERSON that read: "He just pulled up I'm bout to leave".  SA McSheehy then observed ANDERSON walk over to the Dodge Charger and enter the front passenger seat.  The Dodge Charger then repositioned to Pump 1 in the Loves Travel Center parking lot.  ANDERSON remained in the Dodge Charger for a period of approximately forty-five (45) seconds before exiting the Dodge Charger and walking back over to the Chevrolet

Tahoe, where he was observed entering the driver's seat.  South Carolina license plate WBH 384 is registered to Larry Donell RILEY, Jr. at 36 Longleaf Road, Varnville, SC.

20.    At approximately 6:28 pm, SA McSheehy observed the Dodge Charger leave the Loves Travel Center parking lot, followed shortly after by the Chevrolet Tahoe.  SA Roddy Rape and SA James Duffy conducted surveillance on the Dodge Charger as it traveled southbound on Interstate 95.  The Chevrolet Tahoe also traveled southbound on Interstate 95, as observed by SA McSheehy and exited the interstate at the Cossawhatchie exit.  At this juncture, SA McSheehy continued down the interstate to assist SA Rape and SA Duffy with the ongoing surveillance of the Dodge Charger that continued southbound on Interstate 95 past the Coosawhatchie exit.

21.    At approximately 6:47 pm, the Chevrolet Tahoe being driven by ANDERSON and BOOKER arrived at 6841 Bees Creek Road, Ridgeland, SC to conduct the controlled purchase of the crystal methamphetamine and fentanyl. Approximately two minutes later, after meeting with the CS and UC, the Chevrolet Tahoe left the area.  During the controlled purchase, BOOKER provided the UC with the ten (10) fentanyl pills and approximately six (6) ounces of crystal methamphetamine in exchange for the prerecorded funds.

22.    Once the controlled purchase was completed and ANDERSON and BOOKER departed the area, the UC and CS departed the location and were followed to a predetermined meeting location where the fentanyl and crystal methamphetamine were secured.  Agents also retrieved the audio/video surveillance equipment that was utilized during the controlled purchase. The CS was then debriefed by agents about the controlled purchase from ANDERSON and BOOKER.

23.    SA Rape and SA Duffy followed the Dodge Charger on Interstate 95 to Exit 5 (Hardeeville Exit).  Upon exiting Interstate 95 southbound, the Dodge Charger took a left at the

exit ramp onto Whyte Hardee Boulevard.  At approximately 6:55 pm, SA Rape then observed the Dodge Charger turn right into the Econo Lodge hotel located at 19534 Whyte Hardee Boulevard, Hardeeville, SC and drive to the back side of the hotel.  At approximately 6:55 pm, SA McSheehy and TFO Jarrell were able to identify that RILEY entered Room 130 of the Econo Lodge. Surveillance was conducted on the Dodge Charger and at approximately 7:29 pm, a marked Jasper County Sheriff's Office patrol car conducted a lawful traffic stop on the Dodge Charger and positively identified RILEY as the driver and the only occupant of the vehicle.

24.     The DEA Mid-Atlantic Laboratory confirmed that the substance contained in the clear plastic bag was 1.02 grams of Fentanyl and 170.3 grams of Methamphetamine Hydrochloride with a substance purity of 97%.

**CONTROLLED PURCHASE #3**

25.     On March 21, 2023, the DEA CRO, SLED, JCSO and HPD utilized the CS and UC to conduct a controlled purchase of fentanyl pills and crystal methamphetamine from ANDERSON.  During the previous day, the CS contacted ANDERSON through phone calls and text messages to arrange and verify the purchase of fentanyl pills and crystal methamphetamine.

26.     At approximately 3:00 pm, SAs Rod Rape, Rod Barboza and Brendan McSheehy, along with TFO Jason Jarrell, established physical surveillance on 203 McDill Lane, Hampton, SC.  At this time, surveillance agents observed the Chevrolet Tahoe and a black Jaguar parked at the residence.  At approximately 3:39 pm, video surveillance of 203 McDill Lane indicated that ANDERSON exited the residence but then walked back inside the residence.  At approximately 3:45 pm, video surveillance indicated that ANDERSON exited the residence again and entered the Chevrolet Tahoe.  As the Chevrolet Tahoe left the residence, agents followed the vehicle to a

10

house located at the intersection of School Street and Live Oak Street, Hampton, SC. The Chevrolet Tahoe was then followed back to the 203 McDill Lane, arriving at approximately 3:58 pm. ANDERSON was then observed entering the residence.

27.     At approximately 4:02 pm, ANDERSON was observed exiting the residence with a yellow plastic bag in his hand. ANDERSON entered the Chevrolet Tahoe and placed the yellow plastic bag into the vehicle. Surveillance attempted to follow the Chevrolet Tahoe as it left 203 McDill Lane but ultimately lost the Chevrolet Tahoe in the vicinity of Hickory Hill Circle, Varnville, SC. At approximately 4:59 pm, surveillance observed the Chevrolet Tahoe arrive at 6841 Bees Creek Road, Ridgeland, SC to conduct the controlled purchase of illegal drugs with the CS and UC. When the Chevrolet Tahoe arrived at 6841 Bees Creek Road, Ridgeland, SC, Roy FELDER was in the passenger seat of the Chevrolet Tahoe. According to Department of Motor Vehicles (DMV) records, FELDER resides at 109 Hickory Hill Circle, Varnville, SC. Agents believe that when surveillance was lost on the Chevrolet Tahoe in the area of Hickory Hill Circle, that ANDERSON had picked up FELDER in order to have FELDER conduct the hand-to-hand transaction with the CS and UC. During the controlled purchase, FELDER provided the UC with the ten (10) fentanyl pills and approximately six (6) ounces of crystal methamphetamine in exchange for the prerecorded funds. The illegal drugs were contained in the same yellow bag that ANDERSON was seen carrying out of his residence.

28.     Once the controlled purchase was completed and ANDERSON and FELDER departed the area, the UC and CS departed the location and were followed to a predetermined meeting location where the fentanyl and crystal methamphetamine were secured. Agents also retrieved the audio/video surveillance equipment that was utilized during the controlled purchase. The CS was then debriefed by agents about the controlled purchase from ANDERSON/FELDER.

29.     The DEA Mid-Atlantic Laboratory confirmed that the substance contained in the clear plastic bag was .99 grams of Fentanyl and 171.461 grams of Methamphetamine Hydrochloride with a substance purity of 80%.

## CONTROLLED PURCHASE #4

30.     On June 5, 2023, the DEA CRO, SLED, JCSO and HPD utilized the CS and UC to conduct a controlled purchase of ten (10) fentanyl pills from ANDERSON at the public parking lot located at 81 Main Street, Varnville, SC.

31.     At approximately 3:49 pm, agents and detectives met with the CS at a pre-determined meeting location to set up the controlled purchase of fentanyl pills from ANDERSON. At approximately 3:56 pm, Agent Hallie Godley (SLED) searched the CS for contraband with negative results. At approximately 4:49 pm, the CS texted ANDERSON and stated, "Did you find out how many and how much so I can have it right? I'm trying to hang on." At approximately 5:30 pm, ANDERSON replied, "Ok and I just called him he sell his for 30 but I told him it's for my ppl so he goin to do them for 25."

32.     At approximately 6:08 pm, the CS texted ANDERSON and stated, "We almost to Varnville," ANDERSON replied, "Ok, just let me know when you there, Hold up." The CS replied, "Okay." ANDERSON then texted the CS, "I'm going to meet you for him so everything cool." The CS replied, "Okay. Where you want me?  We at the fork," ANDERSON replied, "Post office I guess." At approximately 6:14 pm, the UC was provided with $250 of pre-recorded HIDTA authorized funds and audio/video equipment to utilize during the controlled purchase. At approximately 6:35 pm, the CS and UC arrived at the post office for the controlled purchase. At approximately 6:32 pm, ANDERSON stated, "Ok, I'm in Hampton bout to pull up to his house."

At approximately 6:44 pm, ANDERSON stated, "Otw, what are you riding in?" The CS responded, "My brother truck, taking Nancy to pee lol." ANDERSON replied, "It's going to be in the door and you can just put his money in the door." At approximately, 6:51 pm, ANDERSON arrived at the post office for the controlled purchase. The CS walked over to the passenger side door of the Toyota Camry driven by ANDERSON, placed the money in the door and retrieved a white tissue containing a plastic bag containing blue pills. The CS had a brief conversation with ANDERSON, then returned to the UC vehicle. At approximately 6:52 pm, the controlled purchase was completed and both ANDERSON and the UC vehicle departed the area.

33.    At approximately, 6:59 pm, the CS and UC arrived back at the pre-determined meeting location. The CS provided TFO Gurrieri with a white tissue containing a clear plastic bag containing ten (10) blue pills. At approximately 7:07 pm, Agent Godley searched the CS for contraband for negative results. The ten (10) fentanyl pills were field tested and were positive for the presence of fentanyl. At this time, the DEA Mid-Atlantic Laboratory has not yet analyzed the fentanyl pills and provided an analysis.

**EXECUTION OF ARREST AND SEARCH WARRANTS**

34.    On June 14, 2023, John ANDERSON, Aaron BOOKER, Roy FELDER and Larry RILEY Jr. were indicted by a federal grand jury in Charleston, SC and arrest warrants were issued. On June 15, 2023, United States Magistrate Judge Mary Gordon Baker signed a search warrant affidavit which authorized agents to conduct a federal search warrant at the residence located at 203 McDill Lane, Hampton, SC.

35.    On June 21, 2023, the DEA CRO and JCSO conducted a traffic stop on ANDERSON as he crossed into South Carolina from Georgia. After taking ANDERSON into

custody, a search incident to arrest was conducted on the Chevrolet Tahoe that ANDERSON was driving at the time. During the search incident to arrest, two (2) firearms were located in the center console of the vehicle. One of the firearms was a Taurus G2S 9 mm (S/N: TLU75445) and the second firearm was a Glock 30s .45 cal. (S/N: XRP920). Also recovered during the search of the vehicle were three (3) cellular telephones being utilized by ANDERSON. **Phone I** was a white Apple iPhone with a clear case, **Phone II** was a gray Samsung cellular telephone with a brownish/clear case (IMEI 1: 351558960200287, IMEI 2: 352618330200281, S/N: RFCN707LZHR), and **Phone III** was a gray Apple iPhone with a reddish/clear case.

36.     After ANDERSON was in custody, agents executed the search warrant at ANDERSON's residence located at 203 McDill Lane, Hampton, SC. While arriving on scene to execute the search warrant, agents observed BOOKER on the front porch and took him into custody. At the time of arrest, BOOKER was in possession of a clear plastic bag containing a rock-like substance which field-tested presumably for cocaine base (i.e. "crack" cocaine) and two cellular telephones: **Phone IV**, a black Nokia cellular telephone (Model N139DL), assigned phone number: (803) 942-4023; and **Phone V**, a black Nokia cellular telephone with a cracked screen. After BOOKER was taken into custody, agents executed the search warrant at 203 McDill Lane, Hampton, SC. During the search of the residence, agents recovered two (2) more cellular telephones belonging to ANDERSON: **Phone VI**, a Samsung Galaxy S7 cellular telephone, and **Phone VII**, a black Galaxy Note8 cellular telephone.

37.     During the execution of the search warrant at 203 McDill Lane, Hampton, SC, other agents located and arrested Roy FELDER at his residence located at 109 Hickory Hill Circle, Varnville, SC. During the arrest of FELDER, agents recovered two (2) cellular telephones: **Phone VIII**, a black Alcatel cellular telephone (Model A406DL) assigned phone

14

number: 854-213-0757; and **Phone IX**, a black Motorola cellular telephone (Model moto e6 XT2005DL) assigned phone number: (803) 398-6315.

## CONCLUSION

38.    Based on the foregoing, my training, experience, and participation in other investigations involving drug trafficking organizations and the current investigation of ANDERSON, I believe that ANDERSON, BOOKER, FELDER, and RILEY are all involved in the illegal distribution of controlled substances. I further believe, based on my training, experience and the evidence obtained in the current investigation, that the communications to coordinate their illegal activities takes place over cellular telephones either via phone calls, text messages, Face Time, Face Book messenger, or any other applications that can be downloaded to a cellular telephone for the express purpose of communicating about criminal activity.  Based on my training and experience, I also know that drug dealers commonly carry multiple cellular telephones in order to segregate portions of their business and/or co-conspirators in the event that one telephone is intercepted or seized by law enforcement. Based on the surveillance and seizures described above, I believe that there is probable cause that ANDERSON, BOOKER, and FELDER used the **DEVICES** to further their drug trafficking; specifically, to coordinate the delivery and receipt of narcotics. As such, I believe the **DEVICES** contain evidence, fruits, or instrumentalities of firearm offenses and drug trafficking in violation of Title 18, United States Code, Sections 922(g) and 924(c), and Title 21, United States Code, Sections 841(a)(1) and 846.

## TECHNICAL TERMS

39.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device(s) used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device(s).

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable

16

storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device(s) designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS:  A GPS navigation device(s) uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation device(s) can give a user driving or walking directions to another location.  These device(s) can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.

17

When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA:  A personal digital assistant, or PDA, is a handheld electronic device(s) used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication device(s) and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device(s).

f.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.    Internet: The Internet is a global network of computers and other electronic device(s) that communicate with each other.  Due to the structure of the Internet, connections between device(s) on the Internet often cross state and international borders, even when the device(s) communicating with each other are in the same state.

40.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at apple.com/iphone/, I know that the **DEVICES** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA as well as providing connectivity to the Internet. In my training and experience, examining data stored on **DEVICES** of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **DEVICES**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41.    Based on my knowledge, training, and experience, I know that electronic device(s) can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device(s).  This information can sometimes be recovered with forensics tools.

42.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the **DEVICES** were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **DEVICES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on an electronic device(s) can also indicate who has used or controlled the device(s).  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device(s) works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device(s) were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how an electronic device(s) was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **DEVICES** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **DEVICES** to human inspection in order to determine whether it is evidence described by the warrant.

46.    *Manner of execution.*  Because this warrant seeks only permission to examine the **DEVICES** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

47.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **DEVICES** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Mike Gurrieri
Task Force Officer
Drug Enforcement Administration

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC
MEANSAND SIGNED BY ME
PURSUANT TO FED. R. CRIM. P. 4.1
AND 4(d) OR 41(d)(3),AS APPLICABLE.

This __30th__ day of _____June_____, 2023,

Charleston, South Carolina

The Honorable Mary Gordon Baker
UNITED STATES MAGISTRATE JUDGE